# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

NASSAU COUNTY PUBLIC ADMINISTRATOR
of the ESTATE OF WALTER ORLANDO
CRUZ PEREZ, Deceased,

Docket No.:
18-cv-5327 (DRH)(AYS)

Plaintiff,

**PLAINTIFFS' FRCP 26 EXPERT DISCLOSURE**

– against –

THE COUNTY OF NASSAU, THE NASSAU
COUNTY POLICE DEPARTMENT, NASSAU
COUNTY POLICE DEPARTMENT OFFICER
NICOLE BETTES, NASSAU COUNTY POLICE
DEPARTMENT OFFICER JACK CASTRONOVA,
NASSAU COUNTY POLICE DEPARTMENT
OFFICER RAY MORAN, NASSAU COUNTY
POLICE DEPARTMENT OFFICER ROBERT
SACCO, NASSAU COUNTY POLICE
DEPARTMENT OFFICER DANIEL CIVORELLI,
NASSAU COUNTY POLICE DEPARTMENT
SARGEANT GUADINO (first name currently
unknown), and JOHN DOES and JANE DOES 1-100,
said names being fictitious and intended to
refer to those individuals and/or entities that acted
as, and/or were employed as, police officers by
THE COUNTY OF NASSAU and/or THE NASSAU
COUNTY POLICE DEPARTMENT in the events
which are the subject matter of this action,

Defendants.

-------------------------------------------------------------X

PLEASE TAKE NOTICE, pursuant to FRCP 26 (a)(2), the plaintiff hereby

exchanges the following expert disclosure:

Dr. Darrin K. Porcher Ed.D.
3222 Cambridge Avenue #2
Bronx, New York 10463

Dr. Porcher will testify in accordance with the facts, opinions, and findings set

forth in his report dated March 24, 2022. Annexed please find the following:

1

1.  Report of Dr. Darrin K. Porcher Ed.D.;

2.  CV and publishing of Dr. Darrin K. Porcher Ed.D.;

3.  Dr. Darrin K. Porcher Ed.D., testimony in the past four years.

Plaintiff reserves the right to supplement all responses through and including the

time of trial.

Dated: New York, New York
April 21, 2022

Yours, etc.,

LIPSIG, SHAPEY, MANUS & MOVERMAN, P.C.

*Elliot M. Schaktman*

By:_____

ELLIOT M. SCHAKTMAN
eschaktman@lipsig.com
40 Fulton Street, 24th Floor
New York, New York 10038-1850
(212) 285-3300

*Attorneys for Plaintiff,*
*NASSAU COUNTY PUBLIC*
*ADMINISTRATOR of the ESTATE OF*
*WALTER ORLANDO CRUZ PEREZ, Deceased*

To:  Ralph J. Reissman, Esq.
Deputy County Attorney
JARED A. KASSCHAU
Nassau County Attorney
One West Street
Mineola, New York 11501

*Attorneys for DEFENDANTS*

NASSAU COUNTY PUBLIC
ADMINISTRATOR of the ESTATE OF
WALTER ORLANDO CRUZ PEREZ,
Deceased

      Plaintiff,

      v.

THE COUNTY OF NASSAU, THE
NASSAU COUNTY POLICE
DEPARTMENT, NASSAU COUNTY
POLICE DEPARTMENT OFFICER
JACK CASTRONOVA, NASSAU
COUNTY POLICE DEPARTMENT
OFFICER RAY MORAN, NASSAU
COUNTY POLICE DEPARTMENT
OFFICER ROBERT SACCO, NASSAU
COUNTY POLICE DEPARTMENT
OFFICER DANIEL CIVORELLI,
NASSAU COUNTY POLICE
DEPARTMENT SERGEANT PETER
GUADINO AND Jon Does and Jane
Does 1-100 said names being fictitious
and intended to refer to those
individuals and/or entities that acted as,
and/or were employed as, police officers
by THE COUNTY OF NASSAU and/or
THE NASSAU COUNTY POLICE
DEPARTENT in the events which are
the subject matter of this action,

      Defendants

18-CV-05327 (DRH)(AYS)

EXPERT REPORT AND DISCLOSURE OF
DR. DARRIN K. PORCHER

March 24, 2022

1

At your request, I have conducted a review of the facts and circumstances surrounding the serious allegations of excessive force in violation of the constitutional rights of Walter Orlando Cruz-Perez to be free from excessive force and County of Nassau Police Department guidelines.

On Saturday, September 23, 2017, the Nassau County Police responded to a call of an emotionally disturbed person inside a multiple dwelling. Upon arrival by Nassau County 4th Precinct police, they observed Walter Perez dancing naked with a bleeding swollen eye while sweating profusely. When the officers verbally engaged Mr. Perez he assumed a fighting stance resulting in officers Tasering him 13 times and placing him in the prone restraint position. Mr. Perez went into cardiac arrest and was pronounced dead at St. John's Hospital.

**Table of Contents**

1. BACKGROUND AND METHODOLOGY ……………………………..…………..5

2. SCOPE OF RETENTION…………………………………………………………6

3. SUMMARY OF FACTS…………………………………….……………………7

4. INVESTIGATION……………………………………………………………..8

5. OPINIONS………………………………………………………………….……18

6. FINDINGS………………………………………………………………………..27

7. CONCLUSION…………………………………………………………………… 30

Exhibit A: Dr. Darrin Porcher CV

My conclusions are set forth below. I have reviewed the following documents in connection with the matter titled NASSAU COUNTY PUBLIC ADMINISTRATOR of the ESTATE OF WALTER ORLANDO CRUZ PEREZ, Deceased v. THE COUNTY OF NASSAU, THE NASSAU COUNTY POLICE DEPARTMENT, NASSAU COUNTY POLICE DEPARTMENT OFFICER JACK CASTRONOVA, NASSAU COUNTY POLICE DEPARTMENT OFFICER RAY MORAN, NASSAU COUNTY POLICE DEPARTMENT OFFICER ROBERT SACCO, NASSAU COUNTY POLICE DEPARTMENT OFFICER DANIEL CIVORELLI, NASSAU COUNTY POLICE DEPARTMENT SERGEANT GUADINO AND Jon Does and Jane Does 1-100 said names being fictitious and intended to refer to those individuals and/or entities that acted as, and/or were employed as, police officers by THE COUNTY OF NASSAU and/or THE NASSAU COUNTY POLICE DEPARTENT in the events which are the subject matter of this action.

-Attorney General Special Investigation Report

-Attorney General Request for Interview of Subject Officers

-NYS Subpoena Re: Jill Hefetez

-2016 Use of Force Chart

-2015 Axon Downloads Combined

-2015 Use of Force Reports

-2015 Use of Force Reports Impact Weapons

-2015 Use of Force Reports OC Spray

-Use of Taser Report Re: Officer Raymond Moran (Shield 3800) Taser X13001W10

-Updated Taser Report Re: Officer Raymond Moran

-Use of Taser Report Re: Officer Nicole Bettes (Shield 3680) Taser X13001RP9

-Updated Taser Report Re: Officer Bettes

-Police Officer Christopher Boccio #3370 Taser Test and Time Discrepancy Report
Concerning Officers Bettes and Moran

-Use of Taser Report Re: Officer Jack Castronova (Shield 9700) Taser X13001VXK

-Nassau County Police Use of Force Report

-Nassau County Police Death of Walter Perez Report by Assistant Chief Kenneth Lack

-Deadly Force Response Team ECD Discharge Investigation Report

-Nassau County Police Department Members Injury/Accident Report Re: Officer Sacco

-Nassau County Police Department Report of Assault on Law Enforcement Officer Re;
Officer Sacco

-Use of Taser Report Re: Officer Robert Sacco (Shield 3414) Taser X13001RPD

-Nassau County Police Department Procedure OPS 12430 Use of Electronic Control
Device (ECD)/Taser

-Deposition of Nassau County Police Department Assistant Chief Kenneth Lack

-Deposition of Nassau County Police Department Police Officer Christopher Boccio –

-Deposition of Nassau County Police Department Police Officer Robert -Deposition of
Nassau County Police Department Police Officer Daniel Civorelli-Deposition of Nassau
County Police Department Police Officer Jack Castronova-Deposition of Nassau County
Police Department Police Officer Nicole Bettes-Deposition of Nassau County Police
Department Lieutenant/Former Sergeant Peter Guadino

-Deposition of Nassau County Police Department Police Officer Raymond Moran

-Nassau County Police Department Procedure OPS 12440 Use of Intermediate Weapons

-Nassau County Police Department Procedure OPS 12460 Deadly Force Response Team

-Nassau County Police Department Procedure OPS 1155 Mentally Disabled Persons

-Nassau County Police Department Procedure OPS 12410 Use of Force-Nassau County
Police Department Procedure OPS 12420 Use of Deadly Force

-Nassau County Police Department Rules ART 9 Disciplinary Action

-Nassau County Police Department Rules ART 23 Police Operations-Integrating
Communications, Assessment, and Tactics (ICAT)

-Nassau County Police Department Police Operations POL 4000-Nassau County Police
Department Training Record Re: Officer Civorelli

-Nassau County Police Department Training Record Re: Officer Sacco

-Nassau County Police Department Training Record Re: Moran

-Updated Training Schedule Re: Officer Bettes

-Updated Training Schedule Re: Officer Moran

-Nassau County Police Department Training Record Re: Castronova
-Nassau County Police Department Training Record Re: Bettes
-Nassau County Police Department Training Record Re: Sgt. Gaudino
-Nassau County Police Department Training Record Re:Paramedic Justin Angell
-Morning Report of Incident Prepared by Detective Brzeski
-Detective Robert Brzaki Reporters Notebook
-Detective Fredrick Goldman Handwritten Notes
-Detective Sergeant Michael E. Bolitho Homicide Notes
-Detective Sergeant George Hoeler Homicide Notes
-Faustino Recinos Statement
-Jesus Gonzalez Statement
-Jose Ayala Statement
-Nassau County Police Department Caser Report
-NYC Office of Chief Medical Examiner Report of Autopsy
-NYC Office of Chief Medical Examiner Forensic Toxicology Laboratory Results
-NYC Office of Chief Medical Examiner Investigation Report
-Nassau County Police Department Arrest Report Melvin Perez
-Nassau County Police Department Request of Taser Dart Release from Medical
Examiner
-NYC Office of Chief Medical Examiner Evidence Department Evidence Receipt
-NYC Office of Chief Medical Examiner Notice of Death
-NYC Office of Chief Medical Examiner Investigation Report
-Photos of Deceased Victim with Taser Probes still inserted
-Nassau County Police Department Detective Division Supplementary Report
-Nassau County Police Department Crime Scene Examination Report
-Nassau County Police Department Dispatcher Event Information
-Nassau County Police Department Event Search
-Nassau County Police Department Background Event Chronology
-Nassau County Police Department Unit Information
-Nassau County Police Department Evidence Transfer Report
-Nassau County Police Department Property Bureau Invoice Re: Officer Jack Castronova
-Nassau County Police Department Property Bureau Invoice Re: Officer Daniel Civorelli
-Nassau County Police Department Property Bureau Invoice Re: Officer Nicole Bettes
-Nassau County Police Department Property Bureau Invoice Re: Officer Raymond
Moran
-Nassau County Police Department Property Bureau Invoice Re: Officer Robert Sacco
-Nassau County Police Department Serious Incident Time Log Worksheet
-Nassau County Police Department Scene Examination Report
-Nassau County Police Department Patient Care Report
-Newsday Article Re: Death of Walter Perez
-Associated Press Article Re: Death of Walter Perez
-NYC Certificate of Death Re: Walter Perez
-Plaintiff's Rule 26 (a)(1) Initial Disclosures
-Plaintiff's Further Rule 26 Disclosure
-Plaintiff's Initial Rule 26 Disclosure
-Defendants Rule 26 (a)(1) Initial Disclosures

-Summons In a Civil Action
-Answer to Amended Complaint
-Surrogate's Court Certificate of Appointment of Administrator
-Defendants' Responses
-Dr. Jennifer Hammer's Report

## 1. BACKGROUND AND METHODOLOGY

My experience and qualifications are set forth at length in my CV which is attached hereto. I began my career as a New York City Police Officer in 1991. I was a commissioned Officer in the United States Army. I have been a member of the New York City Police Department Civilian Complaint Review Division, and a member of the Internal Affairs Bureau. I have also served as an instructor in the Police Academy training officers on the use of force, police operations, the use of a baton and the use of the Taser or the electronic control weapon.

Until my retirement in 2011, I was a Lieutenant assigned to the Community Affairs Bureau and supervised Police and Community Relations as an Integrity Control Officer. These responsibilities included the review of many cases involving civilian complaints, officer use of force, including countless cases involving the use of the Taser and use of force occurrences.

I have been trained and certified in the use of the Taser and expandable baton and have trained countless police officers in the police academy as an instructor on the use of the Taser and physical use of force restraints. During my time in Internal Affairs, I conducted investigations into the use of the Taser and physical use of force applications by police officers to determine whether the police officers' use of the Taser and physical use of force applications complied with the guidelines, policies and procedures set forth by the New York City Police Department, which are virtually identical to those set forth in this case by the Nassau County Police Department.

Such guidelines are often developed in conjunction with – and directly from materials provided by the manufacturers of these Tasers. In connection with those investigations, I have reviewed all of the available evidence, similar to that which was performed by the New York State Attorney General's Office, and the Nassau County Police Department Assistant Chief Kenneth Lack, in this matter, and rendered opinions and conclusions about whether the use of the electronic control weapon, and use of force was consistent with Department policy, general policing practices, and the law.

Where appropriate I have made and recommended punitive and/or corrective action against police officers whose use of the electronic control weapon, and use of force violated the policies and the law.

In addition to these investigations as a part of the New York City Police Department, I have conducted similar investigations on behalf of litigants across the Country, on behalf of both Plaintiffs and Defendants. I have been qualified as an expert witness in police use of force cases in Courts across the Country, and I have never been barred as an expert witness and disqualified for any reason.

5

In any case such as this – and in any investigation in general – the methodology is the same. An investigation starts with a review of all of the facts. An investigator determining whether the use of force was appropriate in a particular situation must look at the evidence presented from different perspectives including those of the police officers, the victims, the civilians, and any independent witnesses. The reviewer must compare each perspective against physical evidence that can be gathered, including any medical evidence and electronic evidence such as police audio and video recordings, or in this case, the electronic recorder data from the Taser. It is not the job of the investigator to determine which side is telling the truth; however, versions of the events that simply do not match up to the physical evidence or are inherently unbelievable can be discounted but not totally disregarded.

The investigator must then compare all of this evidence to the standards which are applicable in each case, the rules which apply to the police officers. These rules come from several places, including the United States Constitution, as implemented by the police departments themselves. These rules are set forth in writing on most occasions, as in this case, with the Nassau County Police Department,

A comparison to the facts and the evidence must then be made to determine whether the officers' actions complied with the guidelines for the appropriate use of force in a given situation.

There is a general concept in policing and the use of force which is worth noting – that an officer is only permitted to use the amount of force necessary to overcome a threat or effectuate an arrest. The 1989 Supreme Court decision, *Graham v. Conner*, describes when police can use force under the standard of reasonableness. Any force use that is not necessary to effectuate an arrest or overcome a threat is simply not authorized by law and is excessive in the context of the use of force by a police officer. Only the minimal amount of force necessary should be used.

This is the methodology I have used, and the countless other internal affairs officers have used in investigating cases such as this, and the methodology I have used in my practice investigating cases in a litigation context as well. I have applied this methodology here.

## 2.    SCOPE OF RETENTION

I was retained by the Law Firm of Lipsig, Shapey, Manus & Moverman, P.C. in November 2021 to study and evaluate the matter involving the use of force by the Nassau Police Department resulting in the death of Walter Perez. I have been retained by the Law Firm of Lipsig, Shapey, Manus & Moverman, P.C. to provide expert opinions and testimony in this matter based on my education, professional knowledge, and experience. More specifically, I have been asked to determine whether the policies and practices of the Nassau County Police Department contributed to the death of Walter Perez.

In this report, I have described my opinions and the bases for those opinions. In reaching the opinions expressed in this report, I have relied upon my education, my more than twenty years of professional knowledge and experience on the subjects of police discipline. I have also relied upon my review of case documents and discovery commonly relied upon by experts in my field.

The documents and discovery relied upon include those cited in this report. I also considered the pleadings, discovery responses and the documents exchanged by the parties in discovery. Further, I have relied upon my experience as a former NYPD Lieutenant assigned to the Internal Affairs Bureau which is commonly accepted and held reliable by experts in my field. My hourly billing rate for my work on this case is $300.00 for field work, research and preparation time; $3,000.00 per day for depositions; and $3,000.00 per day for trial testimony. The amount of my fee is not contingent upon the opinions expressed herein or the outcome of this matter.

If additional relevant information becomes available, I reserve the right to revise my opinions. I may also provide supplemental and/or rebuttal opinions regarding this case, if requested. References cited in this report are not to be exhaustive but rather exemplary. The opinions described in this report are made to a reasonable degree of certainty in my field and were arrived at using the same methodology and principles I employ in my non-litigation projects.

## 3. SUMMARY OF FACTS

On September 23, 2017, at approximately 2:15 am, Mr. Perez's landlord Jose Ayala placed a call to 911. This was concerning his tenant Walter Perez in the basement apartment of 230 Doughty Blvd, Inwood NY, intoxicated, while banging and screaming.

At 2:24 am, Nassau County police officers (NCPD) Raymond Moran and Jack Castronova, were assigned the call for assistance. Nassau County police officers (NCPD) Robert Sacco, and Nicole Bettes responded to assist officers Moran and Castronova.

Upon arrival, Mr. Ayala met with the officers and directed them towards the basement. At approximately 2:27 am the officers entered the basement and observed Mr. Perez in the kitchen naked, bleeding from a swollen right eye, sweating profusely while dancing. The door to Mr. Perez's bedroom was laying on the floor in the common area with blood on it along with clothing and other items that Walter tossed from his room.

Upon observing the officers Mr. Perez told them "come" "come" in Spanish. The officers asked Mr. Perez to calm down to no avail. Three minutes upon entering the residence at approximately 2:30am, Officer Sacco stepped outside and requested an ambulance via his police radio because Mr. Perez was emotionally disturbed and injured.

After the officers attempted to talk to Mr. Perez for approximately 5 minutes, he backed into his bedroom while telling the officers he has something for them. Officers Bettes, Castronova, and Sacco followed Mr. Perez into the bedroom and upon entering, Walter went into the back left corner of the room and Officer Castronova turned on the lights.

Officer Moran told officer Castranova "Let's cuff him". The officers attempted to handcuff Mr. Perez but he pulled away. Mr. Perez lunged towards officer Moran while attempting to punch him resulting in officer Moran firing his Taser striking Walter in the chest and abdomen.

After Mr. Perez was initially Tasered, by officer Moran, he removed one of the Taser darts and pushed officer Moran into a closet. Officer Bettes deployed her Taser in dart probe mode on the chest and abdomen of Mr. Perez. Officer Bettes then engaged her Taser seven times in dart probe mode upon Mr. Perez.

The officers wrestled Mr. Perez to the floor and handcuffed him. Officer Daniel Civorelli, arrived on scene and assisted in the handcuffing. While on the floor, Mr. Perez was placed in the prone position while handcuffed. Officers Moran and Bettes activated their Tasers 13 times, both individually and simultaneously for a period of approximately 66 seconds.

At 2:38 am, officer Castranova requested a supervisor via his police radio while Mr. Perez was handcuffed in the prone position. Police medic Justin Angell arrived at 2:40 am and provided a spit mask and Reeves stretcher for Mr. Perez. Mr. Perez went into cardiac arrest and officers Bettes and Civorelli performed CPR upon him.

At 2:48 am, NCPD sergeant Peter Guadino arrived on the scene and EMT Angell transported Mr. Perez to St. John's Episcopal Hospital where he was pronounced dead by Dr. Chan at 3:25 am.

## 4.    INVESTIGATION

On September 23, 2017, at approximately 2:15 am, Mr. Perez's landlord Jose Ayala placed a call to 911 concerning the incident (Attorney General report pg. 1, paragraph 2, line). Mr. Ayala informed the 911 operator that Walter Perez the tenant of basement apartment of 230 Doughty Blvd, Inwood NY, was intoxicated, banging and screaming (Chief Lack report paragraph 12 NC000462).

At 2:24 am, Nassau County police officers (NCPD) Raymond Moran shield #3800, and Jack Castronova shield #9700, while in uniform operating marked police vehicle 408, were assigned the call for assistance and responded to the location (Chief Lack report paragraph 12, NC000462). Nassau County police officers (NCPD) Robert Sacco shield #3414, responded in uniform to assist officers Moran and Castronova in marked police vehicle 402. Officer Nicole Bettes shield #3680, also in uniform responded in marked police vehicle 401 to assist (Chief Lack report paragraph 12, NC000462).

Upon arrival at 230 Doughty Blvd, Inwood NY, Mr. Ayala met with the  officers and directed them towards the basement and followed them downstairs (Chief Lack report paragraph 12, NC000462).  At approximately 2:27 am the officers entered the basement and observed Mr. Perez in the kitchen naked, bleeding from a swollen right eye, sweating profusely while dancing (Attorney General report pg. paragraph 2, line 5). Mr. Perez had blood on his head and extremities.  The door to Mr. Perez's bedroom was laying on the floor in the common area with blood on it along with clothing and other items that Walter tossed from his room (Chief Lack report paragraph 12, NC000462).

At approximately 2:27 am, officers Bettes, Castronova, Moran, and Sacco, entered the residence and observed Mr. Perez acting erratic while naked; therefore, they should have requested the patrol supervisor in accordance with Nassau County Police Department Procedure OPS 1155 Mentally Disabled Persons. The officers clearly assessed that Mr. Perez was an emotionally disturbed person upon arrival; therefore, they should have acted in accordance with Nassau County Police Department Procedure OPS 1155 Mentally Disabled Persons.

As the first officers arriving on the scene at 2:27 am, officers Bettes, Castronova, Sacco, and Moran failed in their obligation to notify the patrol supervisor as per Nassau County Police Department Procedure OPS 1155 Mentally Disabled Persons. The immediate request for sergeant Guadino would have resulted in supervision of the officers while attempting to detain Mr. Perez. Officers Bettes, Castronova, Sacco, and Moran violated Nassau County Police Department Procedure OPS 1155 Mentally Disabled Persons.

The Nassau County Police Department failed to avail officers the assistance of a formal team of mental health professionals to respond to the situation at the time of the incident which was 2:27am (Chief Lack Deposition pg. 29, line16). Nassau County Police Department Procedure OPS 1155 Mentally Disabled Persons offers officers the assistance of the Mobil Crisis Intervention Team consisting of mental health professionals until midnight (Chief Lack Deposition pg. 30, line 9). The Mobil Crisis Intervention Team works with police officers to de-escalate situations (Chief Lack Deposition pg. 30, line 19). The unavailability of the Mobil Crisis Intervention Team during the incident was a contributing factor to the officer's mismanagement of Mr. Perez. Officer Moran stated that he was unfamiliar with the availability or assistance that the Mobil Crisis outreach Team provides to officers when encountering individuals who appear to be having psychiatric issues (Moran Deposition pg. 13, line 12). Officer Bettes also stated that she was unfamiliar with the existence of the Mobil Crisis Outreach Team (Bettes Deposition pg. 13, line 6).

Former sergeant and now lieutenant, Peter Guadino was deposed and stated that as the officer's immediate supervisor on the day of the incident. Lieutenant Guadino he finds it difficult to believe that the officers on scene were unfamiliar with the existence of the Mobil Crisis Outreach Team (Guadino Deposition pg. 15, line 21). Lieutenant Guadino further explained that the Nassau County Police Department provides officers access to information concerning the Mobil Crisis Outreach Team within the computer terminals of each police vehicle (Guadino Deposition pg. 17, line 25).

Upon observing the officers Mr. Perez told them "come" "come" in Spanish (Chief Lack report paragraph 12, NC000462). The officers asked Mr. Perez to calm down to no avail (Attorney General report pg. 1, paragraph 2, line 7). Three minutes upon entering the residence at approximately 2:30am, Officer Sacco stepped outside and requested an ambulance via his police radio because Mr. Perez was emotionally disturbed and injured (Sacco Deposition pg. 73, line12).

After the officers attempted to talk to Mr. Perez for approximately 5 minutes, he then backed into his bedroom unarmed and naked while telling the officers he has something for them (Attorney General report pg. 1, paragraph 3, line 1).

Officers Bettes, Castronova, and Sacco followed Mr. Perez into the bedroom (Chief Lack report paragraph 12, NC000462). Upon entering the bedroom, Mr. Perez went into the back left corner of the room and Officer Castronova turned on the lights and determined that there were no weapons near Mr. Perez (Castronova Deposition pg. 67, line13).

Officers Moran and Bettes were trained in the Nassau County Decision Model on October 28, 2015, which directs officers to gather information and intelligence; however, they failed to remember the contents (Moran Deposition pg. 16, line 15/ Bettes Deposition pg. 13, line 6). Officer's Moran and Bettes didn't attempt to gain a past history concerning emotional or mental issues about Mr. Perez from relatives or friends (Moran Deposition pg. 17, line 20/Bettes Deposition pg. 20, line 13).

Officer Moran told officer Castranova "Let's cuff him" (Castronova Deposition pg. 70, line 24). The officers attempted to handcuff Mr. Perez but he pulled away. The officers attempt to handcuff Mr. Perez which further agitated him (Moran Deposition pg. 45, line. 25). As a result, Mr. Perez lunged towards officer Moran while attempting to punch him (Moran Deposition pg.46, line 5). Officer Moran acknowledged that Mr. Perez wasn't concealing a weapon due to being naked (Moran Deposition pg. 19, line 11). Officer Moran drew his Axon X26P Taser and informed Walter that he was going to Taser him.

This resulted in officer Moran firing his Taser in probe mode striking Walter in the chest and abdomen which was ineffective (Chief Lack report paragraph 12, NC000462). Axon's manufacturer's instructions specifically prohibit Tasering a person in the chest area (Axon manufactures instructions "Probe Targeting") Officer Moran's Taser discharge into the chest of Mr. Perez was in opposition to the manufactures recommendations.

Officer Sacco was standing next to officer Moran when the Taser discharge occurred and doesn't recall him announcing Taser prior to its deployment (Sacco Deposition pg. 55, line 24). The NCPD trains its officers on tactical repositioning which focuses on police moving to a safer distance for containment which is an option to slow down the situation. Officer's Moran and Bettes stated in their depositions that they don't recall being taught tactical repositioning; however, it may have been instructed in the Police Academy (Moran Deposition pg.24, line 23/Bettes Deposition pg. 25, line 6). After entering the bedroom the officers did not make an attempt to reposition or back out of the room (Bettes Deposition pg. 97, line 15). Repositioning or backing out of the bedroom would have been in accordance with tactical repositioning.

The Nassau County Police Department has adopted the Integrating, Communication, Assessment, and Tactics (ICAT) system of training which encourages de-escalation.

ICAT Module 5: Operational safety tactics focuses on using the Critical Decision-Making Model as the foundation. This model reviews critical pre-response, response and post-response tactics to incidents in which a person in behavioral crisis is acting erratically or dangerously but is not brandishing a firearm. It emphasizes concepts such as "tactical pause"; using distance and cover to create time; using time to continue communications, de-escalate

heightened emotional responses, and bring additional resources to the scene; tactical positioning and re-positioning; and teamwork. The ICAT training module also stresses the avoidance of physical force (NC000250).

Officer's Bettes, Sacco, Moran, and Castronova, were trained in the ICAT system; however, they failed to introduce its applications accordingly. The use of distance and cover to create time to continue communications to de-escalate would have best been applied when Mr. Perez backed into his bedroom.

The officers were able to assess that he was unarmed while naked; therefore, an isolation and containment strategy would have slowed down the incident pending the arrival of additional resources. Chief Lack stated that when Mr. Perez backed into the bedroom, the officers were required to develop a plan according to the ICAT system on how to handle Mr. Perez (Chief Lack Deposition pg.80, line 15).

The Attorney General's report acknowledged how the officers mismanaged the situation and should have attempted to maintain distance between themselves and Mr. Perez. The officers should have continued to monitor Mr. Perez, keeping space between him and the officers and using time to defuse his emotions, until the ambulance arrived particularly since Mr. Perez was contained and visible to the officers (Attorney General report pg. 12, line 4).

The Crisis Recognition Module of the ICAT system states most persons with a mental illness are no more likely to be silent than the general population. The officer's role is to verbally de-escalate the situation as much as possible, aiming to get the person to stay where he or she can function and reason more clearly. The subject's first interaction with police is critical, the officer sets the tone and helps chart the course. The Crisis Recognition Module of the ICAT system further states don't rush into situations unless immediate action is required. Move slowly, calm into the situation, and strive to reduce the stress level.

Upon entering the bedroom, Mr. Perez went into the back left corner of the room and Officer Castronova turned on the lights and determined that there were no weapons near Mr. Perez (Attorney General's report pg. 1, paragraph 3, line 4). Mr. Perez was naked; therefore, the officer's danger of being attacked with a weapon was diminished.

The officers were in the bedroom with Mr. Perez for less than a minute when they initiated a Taser deployment (Chief Lack Deposition pg. 99, line 14). The Crisis Recognition Module of the ICAT system states don't rush into situations unless immediate action is required. Move slowly, calm into the situation, and strive to reduce the stress level. The officer's reaction to engage Mr. Perez with a Taser after being in the bedroom for less than a minute introduces a clear example of their failure to develop a plan according to The Crisis Recognition Module of the ICAT system.

Chief Lack stated that when Mr. Perez went into the bedroom the officers were required to develop a plan according to the ICAT system on how to handle Mr. Perez (Chief Lack Deposition pg.80, line 15). Officer Moran and Bettes tactical plan consisted of attempting to handcuff Mr. Perez (Bettes Firearm discharge Investigation Report line 29). Officer Sacco

understood the tactical plan consisted of officers Castranova and Moran physically restraining Mr. Perez for handcuffing. Officer Castranova's tactical plan consisted of apprehending Mr. Perez by grabbing his arms and legs (Bates 446).

Officers Moran, Bettes, Castranova, and Sacco's tactical plan involved the application of physical force to restrain Mr. Perez who was acting erratically while unarmed. ICAT Module 5 titled Operational Safety Tactics encourages a "tactical pause"; using distance and cover to create time; using time to continue communications, de-escalate heightened emotional responses, and bring additional resources to the scene; tactical positioning and re-positioning; and teamwork. Officer Bettes further agreed that closing the distance between the suspect and the officers is not a means to de-escalate a situation (Bettes Deposition pg. 94, line 5).

The ICAT training module also stresses the avoidance of physical force (NC000250). Officers Moran, Bettes, Castranova, and Sacco's tactical plan to employ physical force against Mr. Perez was in opposition to their training associated with ICAT training Module 5 titled Operational Safety Tactics. Officer Bettes acknowledged in her deposition that telling a suspect or stating in front of a suspect "let's cuff him" is not a means of de-escalating a situation (Bettes Deposition pg. 93, line 24).

After Mr. Perez was initially Tasered, by officer Moran, he removed one of the Taser darts (Chief Lack report paragraph 12, NC000462). Mr. Perez then pushed officer Moran into a closet (Attorney General report pg. 6, paragraph 3, line7).

Officer Bettes then activated her X26P Taser in dart probe mode, to the chest and abdomen of Mr. Perez (Bettes Deposition pg. 77, line 11). Axon's manufacturer's instructions specifically prohibit Tasering a person in the chest area (Axon manufactures instructions) Officer Bette's dart probe application to the chest of Mr. Perez was in opposition to the manufactures recommendations. Officer Sacco was standing near officer Bettes when she deployed her Taser; however, doesn't recall hearing her announcing Taser prior to its deployment (Sacco Deposition pg. 56, line 4).

Officer Bettes then engaged her Taser seven times in dart probe mode on Mr. Perez (Attorney General report pg. 6, paragraph 3, line 9). The officers wrestled Mr. Perez to the floor as he continued to flail his arms while resisting. While Mr. Perez was on the floor, Officer Moran Tasered Walter multiple times in drive stun mode in his legs and lower body (Attorney General report pg. 1, paragraph 3, line 7).

Officer Moran stated that he was unaware of the maximum number of times a subject can be Tasered (Moran Deposition pg. 69, line 15). Officer Moran acknowledged that he was aware a sufficient electrical charge can be fatal when he Tasered Mr. Perez on September 23, 2017(Moran Deposition pg. 30, line 15).

Officers Moran and Bettes activated their Tasers, 13 times, both individually and consecutively for a period of approximately 66 seconds (Attorney General report pg. 1, paragraph 3, line 11). The 13 Taser occurrences reflect that Officer Bettes activated her Taser seven times, depressing the trigger for a period of 35 seconds (Use of Taser Report Taser

X13001RP9). Officer Moran activated his Taser six times depressing the trigger for a period of 30 seconds (Use of Taser Report Taser X13001W10).

The officers also appear to have deployed their Tasers simultaneously at times. Nassau County Police Department Procedure OPS 12430 Use of Electronic Control Device (ECD)/Taser states that officers "will discharge no more than 3 successful applications of the ECD [Electronic Control Device/taser] on a single subject (Use of Electronic Control Device OPS 12430, pg. 4, paragraph 7 note). Officers Bettes and Moran were in violation of this policy because a successful Taser application consists of discharging an electrical current into a subject with a Taser.

Nassau County Police procedure Use of Force-General states that a member may use only such force as is "objectively reasonable" under the circumstances. (POL 4000 10 pg. 2 paragraph 2, line 6). The application of 13 Taser occurrences against Mr. Perez is unreasonable; therefore, it's in violation of NCPD policy which also violates the Use of Force-General policy POL 4000 10.

Nassau County Assistant Chief Kenneth Lack ruled on the Use of Force Report that officer Moran and Bettes use of Force and ECD appears to be within departmental guidelines (Chief Lack Deposition pg. 159, line 22). This is troubling considering Nassau County Police Department Procedure OPS 12430 Use of Electronic Control Device (ECD)/Taser states that officers "will discharge no more than 3 successful applications of the ECD [Electronic Control Device/taser] on a single subject. Officers Bettes and Moran were in violation of this policy. Officers Bettes and Moran were never disciplined for their actions in connection with the unauthorized Taser application to Mr. Perez (Chief Lack Deposition pg. 163, line 6).

Chief Lack's failure to identify the excessive deployment of a Taser by officers Moran and Bettes is reflective of a systemic practice in the Nassau County Police Department which failed to identify police misconduct. On October 21, 2021, Chief Lack was deposed and acknowledged that the Taser deployment embarked upon by officers Moran and Bettes against Mr. Perez was unreasonable and not within department guidelines (Lack Deposition pg. 197, line 13).

The NYS Attorney General's Office investigation noted that the Nassau County Police Department needs to develop training programs cautioning NCPD officers concerning the simultaneous deployment of multiple Tasers against the same civilian, as well as multiple uses of a single Taser consecutively for a prolonged period (Attorney General report pg. 11).

Officers Moran and Bettes activated their Tasers simultaneously, 13 times, individually and consecutively for a period of approximately 66 seconds. This application of multiple Tasers repeatedly for an extended period appears to have violated departmental policy (Attorney General report pg. 12, paragraph B).

Nassau County Police Department Procedure OPS 12430 Use of Electronic Control Device (ECD)/Taser states that officers "will discharge no more than 3 successful applications of the ECD [Electronic Control Device/taser] on a single subject.

13

Axon is the manufacturer of the X26P Taser and recommends that officers will announce to cover officers that the Taser is being deployed whenever possible (Axon Taser Guide, General use paragraph line 5). Officer Sacco was standing directly next to officers Moran and Bettes; however, he didn't hear them announce Taser prior to its deployment (Sacco Deposition pg. 56, line 4).

Based on the manufacturer's recommendation concerning the application of a Taser, Officers Bettes, and Moran failed to alert the surrounding officers of their intended execution of a Taser against Mr. Perez. Officers Bettes and Moran disregarded these provisions and recklessly embarked upon excessive usage of a Taser against Walter Perez.

Nassau County Police Department Procedure OPS 12430 Use of Electronic Control Device (ECD)/Taser states that "it is important to communicate the imminent use of the ECD to each other so that Members of the Force will not simultaneously discharge the ECD on a single subject. Officers Bettes and Moran violated the manufacturer's recommendation and NCPD OPS 12430 in connection with announcing that a Taser will be employed to allow cover officers time to position themselves accordingly.

NCPD Procedure OPS #12430 is consistent with guidelines issued by the New York State Division of Criminal Justice Services (DCJS) Municipal Police Training Council (MPTC), which state that generally, only one Taser should be used on a civilian at a time. The MPTC guidelines further states that multiple Taser applications cannot be justified solely because a suspect fails to comply with a command, absent other indications that a suspect is an immediate threat or about to flee from a serious crime. The guidelines recommend that if more than three (3) consecutive cycles are required, officers should reassess the situation and consider transitioning to another applicable force option.

The most common factors that appear to be associated with fatal or other serious outcomes resulting from the use of a Taser include: (1) repeated and multiple application; (2) cycling times that exceed 15 seconds in duration, whether the time is consecutive or cumulative; and (3) simultaneous applications by more than one Taser (Attorney General report pg.13, paragraph 1).

Officer Bettes and Moran Tasered Walter Perez 13 times under the premise that the applications were ineffective. The Axon Taser manufacturer's guidelines define an effective Taser application as electrical current that engages a subject due to the deployment of a Taser. Officer Bettes and Moran's statements in connection with their Taser applications being ineffective were inaccurate based on the Axon Taser manufacturer's guidelines. Based on Officer Bettes and Moran's training, they should have been aware of the Axon Taser manufacturer's recommendation which prohibits continuous Taser application when ineffective. Axon the manufacturer of the X26P Taser advises against numerous and extended Taser applications as follows:

Minimize Number and Duration of CEW Exposures:

14

Avoid repeated, extended, or continuous exposures beyond 15 seconds absent reasonably perceived immediate threat and justification.

Based on the manufacturer's recommendation concerning the application of a Taser, Officers Bettes, and Moran disregarded these provisions and recklessly embarked upon excessive usage of a Taser against Walter Perez. Nevertheless, the NCPD should take whatever actions it deems necessary to address the officers' violation of OPS #12430, including significant additional training (Attorney General report pg. 13, paragraph 1).

At 2:36 am, NCPD officer Daniel Civorelli shield #3800, arrived on scene in marked police vehicle 409, and assisted in the handcuffing of Mr. Perez (Chief Lack report paragraph 12, NC000462). Chief Lack stated that officers were required to develop a plan according to the ICAT system on how to handle Mr. Perez (Chief Lack Deposition pg.80, line 15). On the Police Department County of Nassau, New York Deadly Force Response Team Discharge Investigation Report Inspector James Bartcherer stated Officer Civorelli did not have a plan on how to handle Mr. Perez (Civorelli, Deadly Force Response Team Discharge Investigation Report #30).

Officer Sacco and Civorelli held Mr. Perez in the prone position while in the process of handcuffing Mr. Perez. Mr. Perez was placed on his stomach where officer Bettes and Castronova cuffed his ankles and the other officers cuffed his hands (Bettes Deposition pg. 59, line 25/ Castranova Deposition pg. 79, line 4). Mr. Perez was placed in the prone position by officers Civorelli, Bettes, Moran, Sacco, and Castronova who positioned Walter on his chest (Attorney General's report pg. 1, paragraph 4, line 4).

The prone position restricts the rise and fall of the chest which inhibits breathing. Death due to a head-down position with hyper flexion of the neck can result from police placing suspects in the prone position. It is a critical condition arising out of this particular body positions that can lead to mechanical obstruction of respiration. Restraining a person in a face-down position is likely to cause a greater restriction of breathing than restraining a person face-up.

Multiple cases of death by positional asphyxia have been associated with the prone restraint position. This is especially true when the physical restraint includes placing the individual in a stomach down position. Many law enforcement agencies are taught to avoid restraining people face-down. The officer's immediate supervisor sergeant Guadino agreed that if a person is placed on their stomach it can inhibit their breathing (Guadino Deposition pg. 38, line 24). Sergeant Guadino stated that when a person is handcuffed and restrained, police should place them on their side if it's reasonable so the person can breathe (Guadino Deposition pg. 38, line 15). It does not appear that the NCPD had any policy regarding the use of force while maintaining a detainee in a prone position and this, too, contributed to the lethal outcome in this case.

Officer Moran acknowledged that if someone was on their stomach and pressure was applied to their back compressing the lungs should not be done (Moran Deposition pg. 31, line

24). At 2:38 am, officer Castranova requested a supervisor via his police radio while Mr. Perez was handcuffed in the prone position.

Police medic Justin Angell arrived at 2:40 am; however, he failed to check the vital signs of Mr. Perez until 2:47am. During the period between 2:40 am – 2:47 am, police medic Angell elected to retrieve a spit mask and Reeves stretcher for the officers. Police medic Angell provided no explanation as to why he failed to check Mr. Perez upon entering the residence (Angell Deposition pg. 64, line 9).

Police medic Angell acknowledged in his deposition that he was trained to take vital signs, do an EKG, and evaluate patients that were subjected to a Taser (Angell Deposition pg.11, line 22). Police medic Angell stated that the reason for conducting an EKG is because the Taser consists of electrical activity of the heart. The EKG is applied to make sure there was no disruption of the heart activity and then the patient would be transported to the hospital (Angell Deposition pg. 18, line 12).

Police Medic Angell further acknowledged that whenever someone has been subjected to the electrical current discharge from a Taser, speed is appropriate to get to them as fast as possible to make sure there hasn't been any damage to the heart or the heart beating (Angell Deposition pg. 20, line 19). Police medic Angell clearly understood based on his training that his obligation was to evaluate Mr. Perez; however, he failed to apply his practical training to assess Mr. Perez upon arrival.

None of the officers observed Mr. Perez spitting or throwing any bio hazardous materials at them (Chief Lack Deposition pg. 58, line 18). The spit mask was placed over Mr. Perez's face (Bettes Deposition pg. 55, line 9). Mr. Perez was positioned on his stomach in the prone position from when he was initially handcuffed until after Police medic Angell returned with the Reeves stretcher (Bettes Deposition pg. 57, line 4).

Police medic Angell's first duty was to his patient and he violated that responsibility. During the period between 2:40 am – 2:47 am, officers Civorelli and Sacco were left alone with Mr. Perez and continued to restrain him in the prone position (Civorelli Deposition pg.52, line 20).

Upon returning with the stretcher and spit hood, Police Medic Angell observed that Mr. Perez was still in the prone position. Mr. Perez was bluish in color and not breathing nor was he able to detect a pulse as Walter went into cardiac arrest. The officers removed Walter's handcuffs and placed him on his back as officer Bettes and Civorelli performed CPR upon Mr. Perez (Bettes Deposition pg. 59, line 13).

Police Medic Angell acknowledged that it was important to know at that point whether or not the officers exerted any pressure to the neck or throat of Mr. Perez or back as he was lying face down which could affect breathing (Angell Deposition pg.49, line 25). Police Medic Angell failed to ask the officers if they had applied any pressure to Mr. Perez as stated above which would impact on his breathing (Angell Deposition pg. 50, line 7).

16

During the deposition, Police medic Angell introduced conflicting statements. Police medic Angell stated that upon arrival, Mr. Perez was in the bedroom with the officers while Police medic Angell remained in the common area. Police medic also stated that he was next to Mr. Perez as the officers restrained Mr. Perez on the floor in front of him. Based on the inconsistent statements introduced by Police medic Angell, his testimony remains unreliable.

The Nassau County Decision Making Model directs officers to identify options and contingencies (Moran Deposition pg. 20, line 10). Officer Moran stated in his deposition that his only option was to get Mr. Perez into an ambulance (Moran deposition pg.20 line 14). Officer's Moran Bettes, Sacco, and Castranova, misidentified their options and contingencies because Nassau County Police Department Procedure OPS 1155 Mentally Disabled Persons directs officers to request a supervisor. The immediate request for sergeant Guadino would have resulted in supervision of the officers while attempting to detain Mr. Perez.

At 2:48 am, NCPD sergeant Peter Guadino arrived on the scene which was after Mr. Perez was Tasered and taken into custody (Moran Deposition pg. 55, line 10). Officers Bettes and Civorelli continued to perform CPR upon Mr. Perez as EMT Angell transported them to St. John's Episcopal Hospital where he was pronounced dead by Dr. Chan at 3:25 am (Chief Lack report paragraph 12, NC000462).

The coroner's cause of death was documented Homicide resulting from Excited Delirium due to acute cocaine intoxication following physical exertion with restraint and use of conducted electrical weapon (NYC Medical Examiner Autopsy Report pg. 1). The Medical Examiner has ruled that the death of Mr. Perez was the result of the police actions; the use of a conducted electrical weapon (NYC Medical Examiner Autopsy Report).

Dr. Jennifer L. Hammers, D.O conducted an assessment of the death of Walter Perez and determined that he died as a result of asphyxia due to police restraint. Causes of asphyxia included positioning on his stomach, head turned to the side, pressure of the neck, pressure on the torso, use of wrist and ankle restraints, restraint of hands behind the back, muscle contractions from multiple Taser shocks, and use of a spit mask. Dr. Hammer further documented that repeated and lengthy Taser use was a significant contributing factor to the death of Mr. Perez. Additionally, Dr. Hemmer also documented that evidence supports that Mr. Perez suffered asphyxiation which supports the placement in the prone position coupled with the application of a spit hood were contributing factors. The symptoms stated above are reflective of the Nassau County Police Department and EMT Angell's procedural failures.

The Nassau County Police Department has adopted the Integrating, Communication, Assessment, and Tactics (ICAT) system of training which encourages de-escalation. ICAT was in effect at the time of the incident.

ICAT Module 5: Operational safety tactics focuses on using the Critical Decision-Making Model as the foundation. This model reviews critical pre-response, response and post-response tactics to incidents in which a person in behavioral crisis is acting erratically or dangerously but is not brandishing a firearm. It emphasizes concepts such as "tactical pause"; using distance and cover to create time; using time to continue communications, de-escalate

heightened emotional responses, and bring additional resources to the scene; tactical positioning and re-positioning; and teamwork (NC000250).

Officer's Bettes, Sacco, Moran, Castronova, and Civorelli were trained in the ICAT system; however, they failed to introduce its applications accordingly. The use of distance and cover to create time to continue communications to de-escalate would have best been applied when Mr. Perez went into his bedroom. The officers were able to assess that he was unarmed while naked; therefore, an isolation and containment strategy would have slowed down the incident pending the arrival of additional resources.

The NYS Attorney General's investigation acknowledged this and recommended the NCPD continue to implement programs and review methods to defuse incidents involving individuals who appear to be experiencing excited delirium or a mental health crisis (Attorney General report pg. 11).

## 5. Opinions

My opinions in this case are based upon current information.

### Opinion 1 Failure to Apply De-Escalation Tactics

### Opinion 2 Excessive Taser Deployment

### Opinion 3 Hazardous Placement in the Prone Position

### Opinion 4 Failure to Supervise

### Opinion 5 Failure to Act


**Opinion 1 Failure to Apply De-Escalation Tactics-** The use of force by law enforcement personnel is a matter of critical concern, both to the public and to the law enforcement community. Officers are involved on a daily basis in numerous and varied interactions and, when warranted, may use reasonable force in carrying out their duties. Officers should attempt to utilize de-escalation techniques whenever practicable.

De-escalation tactics have proved to be an essential tool for police departments nationwide. De-escalation training teaches police to create space, slow things down, ask open-ended questions and hold off on the deployment of force and avoid ramping up confrontation.

De-escalation training has been widely implemented by U.S. police agencies in the wake of adverse public reaction to recent controversial police use of force incidents. In general, officers trained in de-escalation apply learned techniques following training.

As first responders and the only professional group available 24 hours a day that can be counted on to make house calls, police officers are regularly involved in situations of human

conflict and or crisis (emotional, physical, etc.) where action is needed. De-escalation training provides officers with an additional skill set to calm individuals experiencing crisis. Police departments have adopted de-escalation training as an additional resource for officers to calm agitated individuals they come in contact with.

The Department of Justice defines "de-escalation" as "the strategic slowing down of an incident in a manner that allows officers more time, distance, space and tactical flexibility during dynamic situations on the street. De-escalation is aimed at calmly communicating with an agitated person in order to understand, manage and resolve their concerns. Ultimately, these actions should help reduce the citizen's agitation and potential for future aggression or violence. De-escalation" training, teaches officers to slow down, create space, and use communication techniques to defuse potentially dangerous situations. It gives officers strategies to more calmly deal with people who are experiencing mental and emotional crises.

De-Escalation is a tactic designed to place officers in a position of advantage when dealing with irrational, unpredictable, or suicidal persons. De-Escalation helps officers stay focused and calm during a crisis situation to bring chaotic moments to as peaceful a resolution as the subject will afford. De-Escalation techniques make use of time, distance, and communication in an effort to minimize the level of force needed in a particular situation. The officers failed to effectively de-escalate the situation with Mr. Perez and utilize time, distance, and communication.

The element of de-escalation is paramount in situations where an officer experiences a recession of force by the suspect. Mr. Perez backed into his bedroom and the officers followed him inside. While in the bedroom officer Castranova turned on the lights and police observed Mr. Perez while naked was not in possession of nor next to any weapons. It was the perfect time for the officers to regress and await additional resources in the form of responding officers and sergeant Guadino.

The Nassau County Police Department has adopted the Integrating, Communication, Assessment, and Tactics (ICAT) system of training which encourages de-escalation.

ICAT Module 5: Operational safety tactics focuses on using the Critical Decision-Making Model as the foundation. This model reviews critical pre-response, response and post-response tactics to incidents in which a person in behavioral crisis is acting erratically or dangerously but is not brandishing a firearm. It emphasizes concepts such as "tactical pause"; using distance and cover to create time; using time to continue communications, de-escalate heightened emotional responses, and bring additional resources to the scene; tactical positioning and re-positioning; and teamwork (NC000250).

Officer's Bettes, Sacco, Moran, Castronova, and Civorelli were trained in the ICAT system; however, they failed to introduce its applications accordingly. The use of distance and cover to create time to continue communications to de-escalate would have best been applied when Mr. Perez went into his bedroom. The officers were able to assess that he was unarmed while naked; therefore, an isolation and containment strategy would have slowed down the incident pending the arrival of additional resources.

The NYS Attorney General's investigation acknowledged this and recommended the NCPD continue to implement programs and review methods to defuse incidents involving individuals who appear to be experiencing excited delirium or a mental health crisis (Attorney General report pg. 11).

It was clear to the officers on scene that Mr. Perez was a non-compliant suspect; therefore, they should have awaited the presence of a supervisory officer and additional resources to take him into custody. Police should refrain from the "all gas and no brakes" philosophy and maintain distance when appropriate as opposed to continuing the confrontation. In my opinion, the officer's failure to regress and await assistance to effectuate a non-compliant suspect's arrest contributed to the lethal outcome in this case.

**Opinion 2 Excessive Taser Deployment-** The United States Supreme Court has ruled that an officer's use of force will be judged in light of an objectively reasonable standard. The reasonableness shall be determined by balancing the nature and quality of the intrusions with the countervailing governmental interests.

When Mr. Perez backed into the bedroom while unarmed and naked officer Moran told officer Castranova "Let's cuff him" (Castronova Deposition pg. 70, line 24). The officers attempted to handcuff Mr. Perez but he pulled away. The officers attempt to handcuff Mr. Perez which further agitated him (Moran Deposition pg. 45, line. 25). As a result, Mr. Perez lunged towards officer Moran while attempting to punch him (Moran Deposition pg.46, line 5). Officer Moran acknowledged that Mr. Perez wasn't concealing a weapon due to being naked (Moran Deposition pg. 19, line 11). Officer Moran drew his Taser and informed Walter that he was going to Taser him. This resulted in officer Moran firing his Taser in probe mode striking Mr. Perez in the chest and abdomen which was ineffective (Chief Lack report paragraph 12, NC000462).

The Axon manufacturer of the X26P Taser prohibits Tasering a person in the chest area (Axon manufactures instructions "Probe Targeting"). Officer Moran's Taser deployment into the chest of Mr. Perez was in opposition to the manufactures recommendations as stated below.



Axon the manufacturer of the X26P Taser recommends that officers will announce to cover officers that the Taser is being deployed whenever possible (Axon Taser Guide, General use paragraph line 5). Officer Sacco was standing directly next to officers Moran and Bettes; however, he didn't hear him announce Taser prior to its deployment (Sacco Deposition pg. 55, line 24).

Based on the manufacturer's recommendation concerning the application of a Taser, officer Moran failed to alert the surrounding officers of his intended deployment of a Taser against Mr. Perez. Officer Moran disregarded this provision and recklessly embarked upon Tasering Walter Perez without offering cover officer the ability to safely move away.

Axon's manufacturer's instructions specifically prohibit Tasering a person in the chest area (Axon manufactures instructions "Probe Targeting") Officer Moran's Taser discharge into the chest of Mr. Perez was in opposition to the manufactures recommendations.

After Mr. Perez was initially Tasered, by officer Moran, he removed one of the Taser darts (Chief Lack report paragraph 12, NC000462). Mr. Perez then pushed officer Moran into a closet (Attorney General report pg. 6, paragraph 3, line 7).

Officer Bettes then applied her X26P Taser in dart probe mode, to the chest and abdomen of Mr. Perez (Bettes Deposition pg. 77, line11). Axon's manufacturer's instructions specifically prohibit Tasering a person in the chest area (Axon manufactures instructions)

21

Officer Bette's Taser discharge into the chest of Mr. Perez was in opposition to the manufactures recommendations. Officer Sacco was standing near officer Bettes when she deployed her Taser; however, doesn't recall hearing her announcing Taser prior to drive stunning Mr. Perez (Sacco Deposition pg. 56, line 4).

Officer Bettes then engaged her Taser seven times in dart probe mode (Attorney General report pg. 6, paragraph 3, line 9). The officers wrestled Mr. Perez to the floor as he continued to flail his arms while resisting. While Mr. Perez was on the floor, officer Moran Tasered him multiple times in drive stun mode in his legs and lower body (Attorney General report pg. 1, paragraph 3, line 7).

Officer Bettes and Moran Tasered Walter Perez 13 times under the premise that the applications were ineffective. An effective Taser application is defined as electrical current that engages a subject due to the deployment of a Taser. The Axon X26P Taser emits 50,000 volts of electricity during each cycle. Based on Officer Bettes and Moran's training, they should have been aware of the Axon Taser manufacturer's recommendation which prohibits continuous Taser application when ineffective. Axon the manufacturer of the X26P Taser discourages the continuous use of a Taser in drive stun mode if the application is ineffective as listed below:

Drive (Touch/Contact) Stun Use
-Avoid repeated drive-stuns if compliance is not achieved

Officers Bettes and Moran introduced continuous Conducted Electronic Weapon (ECW/Taser) exposures to Walter Perez during the incident as follows:

13 total Taser applications to Mr. Perez, for a total of approximately 66 seconds.

The manufacturer's recommendation advises against numerous and extended Taser applications as follows:

Minimize Number and Duration of CEW Exposures:
Avoid repeated, extended, or continuous exposures beyond 15 seconds absent reasonably perceived immediate threat and justification.

Officers Moran and Bettes activated their Tasers simultaneously, 13 times, both individually and consecutively for a period of approximately 66 seconds (Attorney General report pg. 1, paragraph 3, line 11). The 13 Taser occurrences reflect that officer Bettes activated her Taser in dart probe mode seven times, depressing the trigger for a period of 35 seconds (Use of Taser Report Taser X13001RP9). Officer Moran activated his Taser six times depressing the trigger for a period of 30 seconds (Use of Taser Report Taser X13001W10). The officers also appear to have deployed their Tasers simultaneously at times.

Nassau County Police Department Procedure OPS 12430 Use of Electronic Control Device (ECD)/Taser states officers "will discharge no more than 3 successful applications of

22

the ECD [Electronic Control Device/taser] on a single subject. Officers Bettes and Moran were in violation of this policy.

The NYS Attorney General's Office investigation noted that the Nassau County Police Department needs to develop training programs cautioning NCPD officers concerning the simultaneous deployment of multiple Tasers against the same civilian, as well as multiple uses of a single Taser consecutively for a prolonged period (Attorney General report pg. 11).

Based on the manufacturer's recommendation and NCPD policy concerning the application of a Taser, officers Bettes and Moran disregarded these provisions and recklessly embarked upon excessive usage of a Taser against Mr. Perez.

Inadequate training can have a negative impact on the delivery of police services, officer safety, police resources, and the ability of police executives to lead their agencies. The reduction or marginalization of training puts the public at risk because police officers may resort to excessive force due to their inexperience with militarized weapons such as Tasers. Poorly trained officers with the best most technologically advanced weapon such as a Taser in a high stress encounter is far more detrimental than a highly trained officer with an average weapon.

The Nassau County Police Department failed to adequately train officers Bettes and Moran on the use of a taser based on their misunderstanding of an effective application. Officer Christopher Boccio is the Nassau Police Department Taser training coordinator. Officer Boccio acknowledged that officers Bettes and Moran's actions fail to fit the criteria of Nassau County Police Department Procedure OPS 12430 Use of Electronic Control Device (ECD)/Taser (Boccio Deposition pg. 153, line 8).

Nassau County Assistant Chief Kenneth Lack ruled on the Use of Force Report that officer Moran and Bettes use of Force and ECD appears to be within departmental guidelines (Chief Lack Deposition pg. 159, line 22).

This is troubling considering Nassau County Police Department Procedure OPS 12430 Use of Electronic Control Device (ECD)/Taser states that officers "will discharge no more than 3 successful applications of the ECD [Electronic Control Device/taser] on a single subject. Officers Bettes and Moran were in violation of this policy.

Officers Bettes and Moran were never disciplined for their actions in connection with the unauthorized Taser deployment to Walter Perez (Chief Lack Deposition pg. 163, line 6). Chief Lack's failure to identify the excessive application of a Taser by officers Moran and Bettes is reflective of a systemic practice in the Nassau County Police Department which failed to identify police misconduct.

On October 21, 2021, Chief Lack was deposed and acknowledged that the Taser deployment embarked upon by officers Moran and Bettes against Mr. Cruz was unreasonable and not within department guidelines (Chief Lack Deposition pg. 197, line 13). Chief Lack acknowledged that prior cases existed within the Nassau County Police Department where officers

mishandled situations regarding the deployment of Tasers by either simultaneously discharging and/or discharging a Taser more than three times on a subject (Chief Lack Deposition pg. 213, line 8).

Officer Moran stated that he was unaware of the maximum number of times a subject can be Tasered (Moran Deposition pg. 69, line 15). Officer Moran acknowledged that he was aware a sufficient electrical charge can be fatal when he Tasered Mr. Perez on September 23, 2017(Moran Deposition pg. 30, line 15). Officers Moran and Betts stated in their depositions that they believed that a successful application of a Taser means obtaining compliance as opposed to the discharge of electrical current into a subject.

On April 25, 2010, Shuay'b Greenaway was Tasered four times coupled with simultaneous deployments by Nassau County Police which resulted in a jury decision by the court regarding the use of Tasers. This should have acted as a harbinger for both the Nassau County policymakers and Police Department to effectively monitor officers to ensure Taser deployments don't exceed 3 occurrences during an incident.

Police Officer Christopher Boccio is the Nassau Police Department Taser training coordinator. Officer Boccio acknowledged that officers Bettes and Moran's actions fail to fit the criteria of Nassau County Police Department Procedure OPS 12430 Use of Electronic Control Device (ECD)/Taser (Boccio Deposition pg. 153, line 8). Officer Boccio further acknowledged that if officers Bettes and Moran were not disciplined based on their unauthorized Taser deployment then it would signal to them that their actions were reasonable and within departmental guidelines (Boccio Deposition pg. 155, line 5).

I view the excessive use of Taser as a consequence of the department's failure to provide proper supervision and training Mr. Perez clearly responded to the use of force against him in kind, creating a spiral of violence which had a tragic end.

**Opinion 3 Hazardous Placement in the Prone Position**- Officer Sacco and Civorelli held Mr. Perez in the prone position while in the process of handcuffing Mr. Perez. Mr. Perez was placed on his stomach while officer Bettes and Castronova cuffed his ankles and other officers cuffed his hands (Bettes Deposition pg. 59, line 25/ Castranova Deposition pg. 79, line 4). Mr. Perez was placed in the prone position by officers Civorelli, Bettes, Moran, Sacco, and Castronova who positioned Walter on his chest (Attorney General's report pg. 1, paragraph 4, line 4).

It does not appear that the NCPD had any policy regarding the use of the force while maintaining a detainee in a prone position and this, too, contributed to the lethal outcome in this case. Officer Moran acknowledged that if someone was on their stomach and pressure was applied to their back compressing the lungs should not be done (Moran Deposition pg. 31, line 24).

While handcuffed in the prone position. Police medic Justin Angell arrived at 2:40 am; however, he failed to check the vital signs of Mr. Perez until 2:47am. During the period between 2:40 am – 2:47 am, police medic Angell elected to retrieve a spit mask and Reeves stretcher for the officers. Mr. Perez was positioned on his stomach in the prone position from when he was

initially handcuffed until after Police medic Angell returned with the Reeves stretcher (Bettes Deposition pg. 57, line 4).

During the period between 2:40 am – 2:47 am, officers Civorelli and Sacco were left alone with Mr. Perez and continued to restrain him in the prone position (Civorelli Deposition pg.52, line 20).

Police Medic Angell observed that Mr. Perez was bluish in color and not breathing nor was he able to detect a pulse as Walter went into cardiac arrest. The officers removed Walter's handcuffs and placed him on his back as officer Bettes and Civorelli performed CPR upon Mr. Perez (Bettes Deposition pg. 59, line 13).

Police Officers must remain cognizant of conditions hazardous to the arrestee when taking them into custody. The prone position restricts the rise and fall of the chest which inhibits breathing. Death due to a head-down position with hyper flexion of the neck can result from police placing suspects in the prone position. It is well-established that this particular body position can lead to mechanical obstruction of respiration. Restraining a person in a face-down position is likely to cause a greater restriction of breathing than restraining a person face-up.

Multiple cases of death by positional asphyxia have been associated with the prone restraint position. This is especially true when the physical restraint includes placing the individual in a stomach down position. Many law enforcement agencies are taught to avoid restraining people face-down.

NCPD Police Officers Bettes, Moran, Sacco, Castronova, and Civorelli's actions contributed in deadly physical force employed against Mr. Perez which was unreasonable. The constant positioning of Mr. Perez in the prone position fails to run consistent with the best practices in policing.

Police shall utilize the amount of force that is objectively reasonable, considering the totality of circumstances in a given situation, in order to affect an arrest and/or accomplish the lawful performance of duty while protecting the public.

Officers shall use only the amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose. When determining whether to apply force and evaluating whether an officer has used reasonable force, officers should consider the availability of other options and their possible effectiveness. The Nassau County Police Department failed to assess other options of availability such as repositioning subjects placed in the prone position.

The officer's immediate supervisor sergeant Guadino agreed that if a person is placed on their stomach it can inhibit their breathing (Guadino Deposition pg. 38, line 24). Sergeant Guadino stated that when a person is handcuffed and restrained, police should place them on their side if it's reasonable so the person can breathe (Guadino Deposition pg. 38, line 15).

**Opinion 4 - Failure to Supervise** -At 2:30am, Officer Sacco requested medical assistance in relation to an emotionally disturbed person. At 2:38 am, officers requested the presence of sergeant Guadino. Sergeant Peter Guadino arrived at the scene at 2:48 am which was after Mr. Perez was in custody. A case involving an emotionally disturbed person is a high priority incident for a supervisor; therefore, sgt. Guadino's presence was necessary on the scene as per Nassau County Police Department Procedure OPS 1155 Mentally Disabled Persons.

Sergeant Guadino failed to respond immediately upon hearing the 2:30am radio transmission of officer Sacco requesting an ambulance for an emotionally disturbed person. As a first line supervisor, sergeant Guadino was responsible for monitoring his police radio concerning transmissions of importance requiring supervision. Officer Civorelli requested a supervisor at 2:38 am; however, sergeant Guadino should have been proactive and responded at 2:30am as opposed to being reactive and responding at 2:48 am.

As a result of sergeant Guadino's inaction to respond at 2:30am, officers Moran, Bettes, Sacco, Castronova and Civorelli handled an emotionally disturbed person without supervision. Sergeant Guadino's failure to respond when officer Sacco requested an ambulance for an emotionally disturbed person resulted in excessive Taser deployments to Mr. Perez coupled with a prolonged positioning in the prone position while unsupervised.

Almost thirty years ago, the United States Supreme Court held in *City of Canton v. Harris*, 489 U.S. 378 (1989), that local governments can be liable under section 1983 for damages for their deliberately indifferent failures to train or supervise their employees who, as a result, commit constitutional violations.

I view the excessive use of a Taser, failure to employ de-escalation tactics, and improper placement of Mr. Perez in the prone position as consequences of the department's failure to provide proper supervision. The above failures contributed to the fatal occurrence which resulted in the death of Mr. Perez.

**Opinion 5 - Failure to Act-** Police Officers must act upon the duty to intervene, to prevent or stop any member from conducting any act that is unethical or violates law or policy (e.g., excessive, or unnecessary force, theft, fraud, sexual misconduct, harassment and falsifying documents etc.). Ortiz v Kazimer, (1989).

Law enforcement officials have a legal duty to intervene on behalf of a citizen whose rights are being violated. In cases where law enforcement officials do not intercede with their fellow officers to ensure citizens' rights are being protected, they are liable under Section 1983 of the Civil Rights Act of 1871.

According to "Section 1983 Litigation", Section 1983 applies to situations such as unjustifiable arrests, excessive force by a fellow officer, and any constitutional violation by a law enforcement official. If an officer does not act to intervene in a situation where a fellow law enforcement official is engaging in misconduct, they can face serious consequences for themselves and their career. The 2nd Circuit defines the duty to intervene as follows:

"A police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force and may be held liable for his failure to do so if he observes the use of force and has sufficient time to act to prevent." (Figueroa v. Mazza 2016).

Trusting the judgment of your fellow officers while being cognizant of your duty to intervene when necessary is a critical balance to obtain. Even without all of the information, the argument, "It was their call, I was just there," is not enough to shield an officer from liability if s/he enters the scene and fails to intervene when an individual's statutory or constitutional rights are violated. Officers have an affirmative duty to act or report based on a fellow officer's actions. This requires subjective judgment on an officer's part.

Police officers are sworn to protect the constitutional rights of citizens, enforce the laws and comply with agency established rules, regulations, policies, and procedures. Police are held to a higher standard of ethical behavior by society because they are considered the guardians or gatekeepers of public trust. While the majority of police enforce the laws without breaking them, police corruption and misconduct is recognized as a universal problem that is evident in many police departments nationwide.

Police corruption cannot be driven away by repressive or temporary measures. When police misconduct occurs, the agency must have a system in place to investigate and address the behavior. Generally, the systems utilized fall under the purview of Internal Affairs Units.
In addition to the investigation of police misconduct complaints, utilization of early warning systems and performance reviews provide additional data to monitor officers' conduct individually and the force as a whole.

The Nassau County Police Department requires officers to intervene upon observing excessive force. All members of the Nassau Police Department must act upon the duty to intervene, to prevent or stop any member from conducting any act that is unethical or violates law or policy (e.g., excessive or unnecessary force).

Officers Sacco, and Castronova failed to intercede when officers Bettes and Moran excessively Tasered Mr. Perez which was in violation of Nassau County Police Department Procedure OPS 12430 Use of Electronic Control Device (ECD)/Taser.

6.    FINDINGS

As a police procedural expert, I have reviewed the case materials available at this time and have determined that the actions of The Nassau County Police Department and officers Sacco, Castronova, Moran, Bettes, Civorelli, Sacco, and sergeant Guadino were willful, wanton, and a deviation from accepted police practices. Additionally, the Nassau County Executive Ed Mangano, failed to provide oversight upon the Nassau County Police Department which amounted to excessive force against Walter Perez. A municipality is tasked with maintaining a quality assurance mechanism of oversight over all departments within the purview of county government. Liability must be shouldered by Nassau County as a result of the Nassau County Police Departments failed policies.

Police officers are sworn to protect the constitutional rights of citizens, enforce the laws and comply with agency established rules, regulations, policies, and procedures. Police are held to a higher standard of ethical behavior by society because they are considered the guardians or gatekeepers of public trust. While the majority of police enforce the laws without breaking them, excessive force is recognized as a universal problem that is evident in many police departments nationwide.

Excessive force by police cannot be driven away by repressive or temporary measures. Police agencies must have a proactive mechanism in place which trains officers on de-escalation techniques to decrease use of force encounters. Police Departments must also continue to revolutionize internal assessments of its members to ensure officers who pose a propensity for excessive force are monitored. Generally, the systems utilized fall under the purview of Internal Affairs Units. In addition to the investigation of police use of force complaints, utilization of early warning systems and performance reviews provide additional data to monitor officers' conduct individually and the force as a whole.

The Nassau County Police Department's Internal Affairs Bureau failed to proactively impose upon members of the department that excessive force will not be tolerated. Proactive efforts by an Internal Affairs Unit will apprise officers of oversight. Chief Lack stated that no mechanism exists within the Nassau County Police Department that monitors if officers pull the trigger of a Taser three or more times (Chief Lack Deposition pg. 202, line 12).

Officers Bettes and Moran pulled the trigger of their Tasers in excess of three times each during the incident which resulted in Mr. Perez losing his life. If a matrix existed that enabled the Internal Affairs Bureau to view Taser trigger pulls of three or more times during a single incident, it would allow them to spotlight excessive deployments.

Chief Lack acknowledged that prior cases existed within the Nassau County Police Department where officers mishandled situations regarding the deployment of Tasers by either simultaneously discharging and/or discharging a Taser more than three times on a subject (Chief Lack Deposition pg. 213, line 8). Chief Lack's statement acknowledging past instances involving incidents concerning NCPD officers pulling the trigger of a Taser 3 or more times is a clear example of the department's unwillingness to create a monitoring system for excessive Taser use.

Several incidents occurred prior to September 23, 2017 where NCPD officers pulled the trigger of their Taser in excess of the 3 engagement maximum; however, officers were not disciplined. Whenever officers commit prohibited conduct its essential that their disciplined according. If officers are disciplined for prohibited Taser use they are less likely to repeat the same activity (Chief Lack Deposition pg. 254, line 7). Chief Lack acknowledged that disciplining officers for excessive Taser deployments acts as a deterrent for repeated offenses; however, the NCPD failed to discipline officers for excessive Taser deployments prior to September 23, 2017.

On April 25, 2010, Shuay'b Greenaway was Tasered four times coupled with simultaneous deployments by Nassau County Police which resulted in a jury decision by the court regarding the use of Tasers. This should have acted as a harbinger for both the Nassau County policymakers

and Police Department to effectively monitor officers to ensure Taser deployments don't exceed 3 occurrences during an incident.

The Nassau County Police Department possessed clear knowledge concerning excessive Taser trigger pulls; however, they refused to implement a system of oversight. As a result of the NCPD's failure to implement a system monitoring excessive Taser trigger pulls by police, Officers Bettes and Moran embarked upon a campaign of excessive Taser trigger pulls imposed upon Mr. Perez.

The Nassau County police officers on the scene failed to properly apply de-escalation tactics. Officers Moran and Bettes failed to cease and desist Tasering Mr. Perez multiple times upon noticing it was ineffective as per the manufacturer's guidelines listed by Axon.

Mr. Perez was Tasered for a total of 13 times for a period of 66 seconds due to a lack of supervision by Sgt. Guadino. Nassau County Assistant Chief Kenneth Lack ruled on the Use of Force Report that Officer Moran and Bettes use of Force and ECD appears to be within departmental guidelines (Chief Lack Deposition pg. 159, line 22). Nassau County Police Commissioner Patrick Ryder sated the responding officers did everything by the book.

This is troubling considering Nassau County Police Department Procedure OPS 12430 Use of Electronic Control Device (ECD)/Taser states that officers "will discharge no more than 3 successful applications of the ECD [Electronic Control Device/taser] on a single subject. Officers Bettes and Moran were in violation of this policy.

On October 21, 2021, Chief Lack was deposed and acknowledged that the Taser deployment embarked upon by officers Moran and Bettes against Mr. Cruz was unreasonable and not within department guidelines (Lack Deposition pg. 197, line 13).

Officers Bettes and Moran were never disciplined for their actions in connection with the unauthorized Taser application to Walter Cruz (Chief Lack Deposition pg. 163, line 6). Chief Lack's failure to identify the excessive deployment of a Taser by officers Moran and Bettes is reflective of a systemic practice in the Nassau County Police Department which failed to identify police misconduct.

Officer Sacco and Civorelli held Mr. Perez in the prone position while in the process of handcuffing Mr. Perez. Mr. Perez was placed on his stomach while officer Bettes and Castronova cuffed his ankles and other officers cuffed his hands (Bettes Deposition pg. 59, line 25/ Castranova Deposition pg. 79, line 4). Mr. Perez was placed in the prone position by officers Civorelli, Bettes, Moran, Sacco, and Castronova who positioned Walter on his chest (Attorney General's report pg. 1, paragraph 4, line 4).

It does not appear that the NCPD had any policy regarding the use of the force while maintaining a detainee in a prone position and this, too, contributed to the lethal outcome in this case. Officer Moran acknowledged that if someone was on their stomach and pressure was applied to their back compressing the lungs should not be done (Moran Deposition pg. 31, line 24).

Police Officers must remain cognizant of conditions hazardous to the arrestee when taking them into custody. The prone position restricts the rise and fall of the chest which inhibits breathing. Death due to a head-down position with hyper flexion of the neck can result from police placing suspects in the prone position. It is well-established that this particular body position can lead to mechanical obstruction of respiration. Restraining a person in a face-down position is likely to cause a greater restriction of breathing than restraining a person face-up.

NCPD Police Officers Bettes, Moran, Sacco, Castronova, and Civorelli's actions contributed in deadly physical force employed against Mr. Perez which was unreasonable.

Police shall utilize the amount of force that is objectively reasonable, considering the totality of circumstances in a given situation, in order to affect an arrest and/or accomplish the lawful performance of duty while protecting the public.

Officers shall use only the amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose. When determining whether to apply force and evaluating whether an officer has used reasonable force, officers should consider the availability of other options and their possible effectiveness. The Nassau County Police Department failed to assess other options of availability such as repositioning subjects placed in the prone position. The officer's immediate supervisor sergeant Guadino agreed that if a person is placed on their stomach it can inhibit their breathing (Guadino Deposition pg. 38, line 24).

## 7.    CONCLUSION

Nassau County failed to provide appropriate oversight **and training** over the Nassau County Police Department. As a result of this, Nassau County Police Department Officers Bettes and Moran excessively Tasered Mr. Perez coupled with officers placing him in the prone restraint. Officer Christopher Boccio is the Nassau Police Department Taser training coordinator. Officer Boccio acknowledged that officers Bettes and Moran's actions fail to fit the criteria of Nassau County Police Department Procedure OPS 12430 Use of Electronic Control Device (ECD)/Taser (Boccio Deposition pg. 153, line 8).

Nassau County Police Officers failed to apply de-escalation techniques as opposed to applying force to Mr. Perez who was an emotionally disturbed person. Mr. Perez was placed in the prone position which inhibits the rise and fall of his chest resulting in labored breathing.

Dr. Jennifer L. Hammers, D.O conducted an assessment of the death of Walter Perez and determined that he died as a result of asphyxia due to police restraint. Causes of asphyxia included positioning on his stomach, head turned to the side, and pressure of the neck. Dr. Hammer's findings clearly reflect that NCPD officers applied unreasonable force to the neck of Mr. Perez. Upon identifying that Mr. Perez was not breathing, Police Medic Angell acknowledged that he failed to ask the officers if they exerted any pressure to the neck or throat (Angell Deposition pg. 50, line 7). Best practices in policing dictate that officers should avoid pressure to a suspect's neck to prevent asphyxia.

Sergeant Guadino failed to supervise the scene involving the apprehension of Mr. Perez. The Nassau County Police Department failed to provide basic supervision to its officers. The need for supervision of the officers should have been plainly obvious to Nassau County Police Department Policymakers. These above actions and failures to act contributed to the death of Walter Perez while unarmed as a result of a use of force by police.

All of the above opinions contained herein are held to a reasonable degree of professional certainty. I certify and verify under penalty of perjury that the foregoing is true and correct. 28 U.S. Code, sec. 1746.

Executed on March 24, 2022

----------------------

Dr. Darrin Porcher

# EXHIBIT

# A

**Dr. Darrin K. Porcher Ed.D.**

3222 Cambridge Ave #2
Bronx NY, 10463
(347)678-2916 (Preferred Contact)

doctorpnyc@gmail.com

_____
_____
_____
_____
_____
_____

## EDUCATION

September 2011    **Doctorate Degree in Education, Fordham University**
*Dissertation:* "Reducing school misdemeanor assaults in urban settings through school leader and police collaboration: A comparative case study."
**Dissertation Committee:** Bruce S Cooper Ph.D. (chair), Sheldon Marcus Ed.D, and Edgar Tyson Ph.D.

May 2003    **MPA, Marist College, Poughkeepsie, New York**

May 2000    **BS, Organizational Management, St. Joseph's College, Brooklyn,**
**New York**

## PROFESSIONAL POSITIONS

9/2013-Present    **Adjunct Professor**, Pace University, School of Criminal Justice

9/2012-12/2013    **Adjunct Professor**, Fairleigh Dickinson University, School of Criminal Justice

9/2004 – Present    **Adjunct Professor,** Monroe College, School of Criminal Justice

4/1991-4/2011    **Police Officer, Detective, Sergeant, Lieutenant,** New York City Police Department

3/1986 – 3/1990    **Enlisted Airman/Non-Commissioned Officer,** United States Air force

3/1990-3/2003    **Non-Commissioned Officer**, United States Air Force Reserve

3/2003-10/2007    **Commissioned Officer**, Executive Officer 1st FST United States Army
Reserve

## POLICE CAREER

| | |
|---|---|
| 2007-2011 | New York City Police Department: Lieutenant Assigned to the Community Affairs Bureau as a Supervisor of Police and Community Relations and Integrity Control Officer |
| 2004-2007 | New York City Police Department: Lieutenant Assigned to the Internal Affairs Bureau as an Investigative Supervisor |
| 2003-2004 | New York City Police Department: Lieutenant assigned to the NYC Department of Personnel for the purposes of constructing a Promotional Examination for the rank of Lieutenant (open to NYPD Sergeants) |
| 2002-2003 | New York City Police Department: Lieutenant assigned to Transit District 3 (Harlem) as the Platoon Commander and Counterterrorism Coordinator |
| 1998-2002 | New York City Police Department: Sergeant Assigned to the Police Academy as an Instructor |
| 1995-1998 | New York City Police Department: Detective Assigned to the Internal Affairs Bureau |
| 1994-1995 | New York City Police Department: Police Officer Assigned to the Civilian Complaint Review Board |
| 1991-1994 | New York City Police Department: Uniformed Police Officer assigned to Police Service Area 7 (South Bronx) |

## ACADEMIC CAREER

| | |
|---|---|
| 9/2012 | Adjunct Professor, Fairleigh Dickinson University, Teaneck New Jersey: Teaching experience includes onsite instruction for graduate and undergraduate students |
| 9/2004 -Present experience | Adjunct Professor, Monroe College, Bronx New York: Teaching<br><br>Includes online and onsite forum |
| 6/2006-12/2008 | SW BOCES: Homeland Security, Police & Emergency Management Curriculum author and editor |

## COLLEGE TEACHING EXPERIENCE

**Fall 2021 (Pace University)**
CJ-250 Community Relations in the Criminal Justice System

**Spring 2021 (Pace University)**
CJ-242 Crime and Public Policy
CJ-414 Integrity Issues in the Criminal Justice System

**Fall 2020 (Pace University)**
CJ-242 Crime and Public Policy
CJ-250 Community Relations in the Criminal Justice System

**Spring 2020 (Pace University)**
CJ-242 Crime and Public Policy
CJ-414 Integrity Issues in the Criminal Justice System

**Fall 2019 (Pace University)**
CJ-242 Crime and Public Policy

**Spring 2019 (Pace University)**
CJ-242 Crime and Public Policy
CJ-414 Integrity Issues in the Criminal Justice System
CJ-404 Emergency Management

**Fall 2018 (Pace University)**
CJ-242 Crime and Public Policy

**Spring 2018** *(Pace University)*
CJ-242 Crime and Public Policy
CJ-414 Integrity Issues in the Criminal Justice System

**Fall 2017** *(Monroe College)*
CJ-212 Ethical Issues in Criminal Justice

**Fall 2017 (Pace University)**
CJ-242 Crime and Public Policy

**Summer 2017 (*Monroe College*)**
CJ-210 Criminal Investigations
CJ- 212 Ethical Issues in Criminal Justice

**Winter 2017 (*Pace University*)**

CJ-414 Integrity Issues in the Criminal Justice System
CJ-242 Crime and Public Policy

**Winter 2017 (*Monroe College*)**
CJ-212 Ethical Issues in Criminal Justice
CJ-210 Criminal Investigations

**Fall 2016 (*Monroe College*)**
CJ-210 Criminal Investigation

**Fall 2016 (*Pace University*)**
CJ-242 Crime and Public Police

**Summer 2016 (*Monroe College*)**
CJ-212 Ethical Issues in Criminal Justice

**Winter 2016 *(Pace University)***
CJ-242 Crime and Public Policy
CJ-414 Integrity Issues in The Criminal Justice System

**Winter 2016 *(Monroe College)***
CJ-212 Ethical Issues in Criminal Justice
CJ-210 Criminal Investigations

**Fall 2015 *(Monroe College)***
CJ-212 Ethical Issues in Criminal Justice
CJ 210 Criminal Investigations

**Fall 2015 *(Pace University)***
CJ-242 Crime and Public Policy
CJ-242 Crime and Public Policy

**Summer 2015  (*Monroe College*)**
CJ-212 Ethical Issues in Criminal Justice
CJ-212 Ethical Issues in Criminal Justice

**Winter 2015 *(Pace University*)**
CJ-242 Crime and Public Policy
CJ-414 Integrity Issues in The Criminal Justice System

**Winter 2015 (*Monroe College*)**
CJ-210 Criminal Investigations
CJ-212 Ethical Issues in Criminal Justice

**Fall 2014 (*Pace University*)**
CJ-242 Crime and Public Policy

CJ-242 Crime and Public Policy

**Fall 2014 (*Monroe College*)**
CJ-212 Ethical Issues in Criminal Justice
CJ-210 Criminal Investigations

**Spring 2014 (*Pace University*)**
CJ-242 Crime and Public Policy
CJ-305 Criminal Law
CJ-414 Integrity Issues in The Criminal Justice System

***Fall 2013 (Fairleigh Dickinson University)***
CRIM-7070 Contemporary Issues in Crime and Justice ***(Graduate Course)***

***Fall 2013(Pace University)***
CJ-242 Crime and Public Policy

***Fall 2013(Monroe College)***
CJ-212 Ethical Issues in Criminal Justice
CJ-210 Criminal Investigations
CJ-103 Intro to Political Science


***Spring 2013 (Fairleigh Dickinson University)***
CRIM-7020 Ethics, Politics & Justice (**Graduate
Course**)

***Spring 2013 (Monroe College)***
LA-240 Criminology
LA-103 Political Science

***Fall 2012 (Fairleigh Dickinson University)***
CRIM-3313 Analysis of Serial Killers
CRIM-7090 Professional Development Seminar (**Graduate Course**)


***Fall 2012 (Monroe College)***
*LA-240* Criminology
*CJ-202* Prisons: Punishment and Rehabilitation in America
*CJ-211* Police and Community

***Summer 2012***
*CJ-211* Police and Community
*LA-103* Political Science

*Spring 2012*
CJ-212 Ethical Issues in Criminal Justice
CJ-211 Police and Community
CJ-301 Homeland Security


*Fall 2011*
**CJ-212** Ethical Issues in Criminal Justice
CJ-211 Police and Community
LA-103 Introduction to Political Science
CJ-301 Homeland Security Online

*Summer 2011*
CJ-211 Police and Community
CJ-210 Criminal Investigations Online
CJ-211 Police and Community Online
CJ-301 Homeland Security Online

*Spring 2011*
*CJ-211* Police and Community
CJ-210 Criminal Investigations Online
CJ-211 Police and Community Online
CJ 301 Homeland Security Online

*Fall 2010*
CJ-211 Police and Community
CJ-210 Criminal Investigations Online
CJ-2111Police and Community Online

*Summer 2010*
CJ-211Police and Community Online
CJ-210 Criminal Investigations Online

*Spring 2010*
CJ-211 Police and Community Online
CJ-210 Criminal Investigations Online


*Fall 2009*
CJ-211 Police and Community Online
CJ-210 Criminal Investigations Online

*Summer 2009*
CJ-211 Police and Community Online
CJ-210 Criminal Investigations Online

***Spring 2009***
CJ-210 Criminal Investigations Online
CJ-301 Homeland Security Online


***Fall 2008***
CJ-210 Criminal Investigations Online
CJ-301 Homeland Security Online

***Spring 2008***
CJ-210 Criminal Investigations Online
CJ-301 Homeland Security Online

***Fall 2007***
LA-241 Juvenile Delinquency
CJ-311 Organized Crime and Gangs
LA-240 Criminology

***Spring 2007***
LA-241 Juvenile Delinquency
CJ-305 Drugs in America
CJ-326 Sex Crimes


***Fall 2006***
CJ-205 Criminal Procedure and Process
CJ-200 Criminal Law
CJ-305 Drugs in America

***Summer 2006***
CJ-205 Criminal Procedure and Process
CJ-200 Criminal Law
CJ-320 Diversity in the Criminal Justice System

***Spring 2006***
LA-241 Juvenile Delinquency
CJ-311 Organized Crime and Gangs

***Fall 2005***
CJ-240 Correctional Administration & the Law
CJ-205 Criminal Procedure and Process

***Summer 2005***
CJ-240 Correctional Administration & the Law
CJ-101 Introduction to Criminal Justice

***Spring 2005***
CJ-311 Organized Crime and Gangs
CJ-305 Drugs in America

***Fall 2004***
CJ-205 Criminal Procedure and Process


## POLICE TEACHING EXPERIENCE

12/1998-1/2002 New York City Police Academy – Homeland Security, NYS Penal law and Police Science


## LEADERSHIP EXPERIENCE

12/1998- Sergeant, New York City Police Department- As a sergeant in the New York City Police Department I performed a multitude of supervisory tasks. Upon my initial promotion to the rank of sergeant, I was responsible for the supervision of 10 police officers who were required to perform uniformed patrol functions. I applied to and was accepted as an instructor for the New York City Police Academy. In my position as a sergeant within the Police Academy, I provided instruction in the discipline of the New York State Penal Law for over 2000 recruits during a three-year period.

During the terrorist attacks on Manhattan in 2001, I was responsible for the supervision and rescue and recovery of victims in the World Trade Center complex.

In January of 2003, I was promoted to the rank of police Lieutenant and reassigned to Harlem. While in Harlem, I was responsible for 70 subordinates who were under my supervision. I was designated as the counterterrorism expert based on my military background and training.

In 2004, I was assigned to the Internal Affairs Bureau, while in the Internal Affairs Bureau; I constructed various corruption prevention strategies and conducted integrity testing for Police Officers. In addition, I supervised police investigations involving police corruption.

In 2007, I was assigned to the Community Affairs Bureau. In Community Affairs, I was responsible for the integrity and control of all Police Officers assigned to the Community Affairs Bureau within the City of New York. Attended Community Council meetings and interactive

meetings with a variety of NYC communities designed to strengthen police and community relations.

**BUSINESS EXPERIENCE**

Founding Partner Innovative Public Safety & Media LLC

Innovative Public Safety & Media LLC exists to assist agency heads and other policymakers in organizational, structural, and human capital decision-making based on extent research and decades of experience in public safety practice.

Innovative Public Safety & Media is a benchmark organization focused on the complex challenges facing today's public safety practitioners. Innovative Public Safety & Media is committed to sober, objective research and to an approach to problem-solving that is informed by academic rigor and analysis.

Our work is interdisciplinary and broad in scope.

Our work product is free of commercial, partisan, and ideological bias. Innovative Public Safety & Media is committed to the public good.

Personal Protection for the following celebrities:

Mariah Carey

Nas (Nasir Jones)

DMX (Earl Simmons)

Interscope Records (CEO)


**EXPERT WITNESS**

As a Sergeant in the NYPD Police Academy, I trained thousands of Police Officers on procedural guidelines, use of force, court testimony, and law. As a Lieutenant in the NYPD Internal Affairs Bureau, I disciplined numerous Police Officers, Sergeants, Detectives on procedural infractions coupled with testimony in the NYPD trial room on behalf of the New York City Police Department. Numerous appearances as an expert in high profile trials and depositions in both State and Federal court.


**CURICULUMN EXPERIENCE**

1999-2002 Police Academy - Produced curriculum for probationary police officers on homeland security and taught police procedural guidelines to newly hired recruits


From 2006-2008, I was hired by BOCES Southern Westchester to develop a curriculum in Homeland Security and emergency management for high school students. This consisted of collecting literature and practical items and compiling them for instruction to students in a

police, EMS and fire safety. The data collection alone took 18 months, and the creation of the written curriculum took 6 months. Subsequently, the course was completed and certified by the State of New York.

## MILITARY EXPERIENCE

United States Army Commissioned Officer, I managed budget and acquired logistics and provided leadership to enlisted soldiers in the capacity of the Executive Officer. From 2003-2007, I was the executive officer of the 1st FST Army unit assigned to Fort Totten Queens, NY. In my capacity as the executive officer, I was the second in command answering directly to the commanding officer. I was responsible for monitoring the promotion board, physical training assessment, weight management and Officer Performance Reports. As a commissioned officer in the Army during a time of war I was tasked with ensuring that the unit was prepared in various aspects of counterterrorism. I constructed a series of homeland security professional development seminars for enlisted soldiers and my fellow officers to ensure unit compliance. I was also responsible for maintaining discipline within the unit and ensuring that all supply levels were adequate for wartime deployment.

## EXAMINATION DEVELOPMENT

In May of 2002, I was assigned to the New York City Department of Personnel as the author of the 2003 New York City Police Department promotional exam for the rank of Lieutenant. In my role as the author of the Lieutenants exam, I conducted a critical assessment of the job description of a police sergeant. This assessment was transferred into a knowledge-based examination which required 5,560 sergeants to utilize critical thinking and literature linked to the job description of a New York City Police Lieutenant.

## STRENGTHS

Expert in implementing counterterrorism strategies and conducting homeland security needs assessment evaluations based on prior military training

Capable of creating and implementing public policy and managing a municipal budget based on MPA and current Doctoral Studies program

Expert in identifying violence in public high schools based on dissertation research

Able to manage community and police relations based on years of experience within the Community Affairs Bureau of the New York City Police Department

Public Speaking ability based on experience within the Community Affairs Bureau and as an Adjunct Professor, Monroe College, Fairleigh Dickinson University, and Pace University.

NYPD Internal Investigator and Supervisor based on experience within the Internal Affairs Bureau

42

Expert in 21st Century Policing and deployment of police personnel. Able to assist communities and law enforcement agencies to strengthen trust while maintaining a semiotic relationship and simultaneously reducing crime

Police Procedural and use of force expert with national trial experience and numerous court deposition appearances as a subject matter expert

## AWARDS

2008-2011 **NYPD Perfect Attendance Award,** New York City Police Department

2006 **Iraq Enduring Freedom Award,** United States Army

2000 **Unit Citation Award,** New York City Police Department

1994 **Excellent Police Duty**, New York City Police Department

1993 **Excellent Police Duty,** New York City Police Department

1992 **Excellent Police Duty,** New York City Police Department

1991 **Iraq Desert Shield Desert Storm Award,** United States Army

1990 **Meritorious Service Award,** United States Army


### Panels

2015 Presenter- New York State Bar Association Annual Forum on Race Justice and Police Reform
2016 HOT 97FM Push for Peace Panel to Reduce Gun Violence in New York City


### Media Commentator

I continuously participate as a media commentator for a multitude of television and radio entities within the New York City metropolitan area on terminal issues of Criminal Justice. I

currently and regularly make appearances with the following entities as a Criminal Justice and police tactics and procedural expert

New York 1 Television News (Inside City Hall)
Fox 5 News
Pix 11 Morning News
Hot 97 FM Radio
BBC Television
United Nations Associated Press (Russia, Turkey)
Al Jazeera America
Fox Network, Fox & Friends, Fox Business, Laura Ingram
Riverdale Press Newspaper
Fox News Nancy Grace
Court TV
CNN, Anderson Cooper 360, Erin Burnett Out Front, Cuomo Primetime
PBS
ABC News
CBS News
Bronx Net
MSNBC
NBC Nightly News with Lester Holt
Wendy Williams Show

### PUBLISHING

*Journal Article: Race and Social Problems*, February 15, 2012

Racial Group Comparisons of Conceptualizations of Rap Music Constructs: A Cross-Racial

Validity Study of the Rap Music Attitude and Perception Scale

Various Newspaper articles with publications in the New York City area

**DISSERTATION ABSTRACT**

REDUCING SCHOOL MISDEMEANOR ASSAULTS IN URBAN SETTINGS THROUGH

SCHOOL COLLABORATION BETWEEN SCHOOL

LEADERS AND POLICE: A COMPARATIVE

CASE STUDY

Darrin K. Porcher, EdD

Fordham University, New York, 2011

The purpose of this study was to identify how urban high schools can improve safety and reduce the number of misdemeanor assaults among students. The focus of the study was to determine if the leadership within three urban public high schools reduced misdemeanor assaults in their respective facilities through a collaboration with police. A review of school records revealed that all three large, urban high schools in the study initially had a high number of misdemeanor assaults, followed by a substantial reduction in assaults within a 3-year period. All three high schools had newly appointed principals at the beginning of the reduction period.

The principal in Public High School 1 employed a management strategy focused on collaboration with the police. The principal held regular strategy meetings with his staff, producing staff behaviors consisting of a closer administrative presence during arrivals, dismissals, and changes in periods. The strategies employed in Public High School 1 resulted in an 84% reduction in misdemeanor assaults over a 3-year period.

The principal in Public High School 2 also used a management strategy focused on collaboration with the police, and the principal relied on the knowledge base of his newly assigned dean of discipline, who had an extensive background in safety. Staff members became highly visible in the school hallways and corridors during student arrivals, dismissals, and changes in periods, resulting in greater supervision and contributing to a reduction of 42% in misdemeanor assaults over a 3-year period.

The principal of Public High School 3 and a safety advisor appointed by the school board focused on a strategy of mediation and faculty oversight coupled with collaboration with police. The strategy resulted in a 46% reduction in misdemeanor assaults over a 3-year period.

**TESTIMONY WITHIN THE LAST FOUR YEARS**

2018 Deposition
Zacarias (Plaintiff)
v Town of Cicero  Police Department
Circuit Court of Cook County, Illinois 2015L013076
2018 Case where I represented the plaintiff concerning the wrongful injury by a police vehicle
resulting in a settlement

2020 Trial
New York v Harris (Defendant Harris)
Bronx County Supreme Ct 1672/2018
2020 Case where I represented the defendant resulting in a not guilty verdict involving gun
possession.

2020 Deposition
Estate of CODY CASE NO.: 16-CA-002013 HEALEY, deceased, for the benefit of FLA BAR
NO.: 0739685 his survivors and estate, Plaintiff, v. DAVID MORGAN, in his official capacity
as SHERIFF, ESCAMBIA COUNTY, FLORIDA
2020 Case where I represented the plaintiff's estate concerning police excessive force

2021 Deposition
Lionel Allen (Plaintiff) v
Joliet Police Department
IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION Case No. 18-cv-04047
2021 Case where I represent the plaintiff in an employment discrimination matter still active

2022 Trial
Re: ROBERT THOMAS and CHRISTINE TENNANT, v CITY OF MCKEESPORT POLICE
DEPARTMENT and CITY OF MCKEESPORT, et al. Case #GD-18-002896 Alegheny  County Court

I represented the plaintiff against the City of McKeesport Police Department Pennsylvania